## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| YAA ASANTE-ADDAE, | : | CIVIL ACTION NO. |
| | : | |
| Plaintiff, | : | 3:13-CV-00489 (VLB) |
| | : | |
| v. | : | |
| | : | |
| SODEXO, INC. | : | |
| Defendant. | : | March 31, 2015 |

## MEMORANDUM OF DECISION GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [Dkt. #60] AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [Dkt. #63]

I.    **Introduction**

The Plaintiff, Yaa Asante-Addae ("Asante"), brings this action alleging that the Defendant, Sodexo Inc., ("Sodexo"), discriminated and retaliated against her in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*; the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*; and the Connecticut Fair Employment Practices Act ("CFEPA"), Conn. Gen. Stat. § 46a-60(a), *et seq.*  Asante also brings claims under Connecticut state law for breach of contract and intentional and negligent infliction of emotional distress.  Currently pending before the Court are the parties' motions for summary judgment.  For the reasons that follow, the Defendant's Motion for Summary Judgment is GRANTED, the Plaintiff's Motion for Summary Judgment is DENIED, and Plaintiff's complaint is DISMISSED.

1

## II.    Factual Background

The following facts relevant to the parties' motions for summary judgment are undisputed unless otherwise noted.

Asante is an African-American female who was born in Ghana, Africa, in 1959, and has lived in the United States since 1986.  [Dkt. #62, D's Local Rule 56(a)(1) Statement at ¶ 1; Dkt. #63-2, P's Local Rule 56(a)(1) Statement at ¶ 1; Dkt. #66, P's Local Rule 56(a)(2) Statement at ¶ 1; Dkt. #68, D's Local Rule 56(a)(2) Statement at ¶ 1].  Sodexo is a provider of food services to clients in the corporate, education, government, senior living, and health care sectors.  [Dkt. #61 at 1].  Sodexo offers its services primarily "on-site," meaning it assigns its employees to a client account and employees then work at the client's facilities.  [*Id.*].

Asante was hired by Sodexo in September 2008 and was placed at Sodexo client AEGON USA, in Cedar Rapids, Iowa.  [Dkt. #63-2, P's Local Rule 56(a)(1) Statement at ¶ 7; Dkt. #68, D's Local Rule 56(a)(2) Statement at ¶ 7].  In 2009, while working at AEGON, Asante received a strong performance review, a compensation increase, and multiple performance-based awards.  [*Id.*].  In March 2010, after requesting a transfer, Asante was offered and accepted the position of Sodexo General Manager with Sodexo client ECHN Manchester Memorial Hospital and Rockville Health Network ("ECHN MMH") in Manchester, Connecticut.  [Dkt. #62, D's Local Rule 56(a)(1) Statement at ¶ 2; Dkt. #66, P's Local Rule 56(a)(2) Statement at ¶ 2].  To obtain this position, Asante interviewed with Elizabeth Butler ("Butler") of ECHN MMH, and Sodexo District Manager Thomas Farrell ("Farrell").  [Dkt. #63-2, P's Local Rule 56(a)(1) Statement at ¶ 10; Dkt. #68, D's Local Rule 56(a)(2) Statement

at ¶ 10]. During this interview, Asante claims, and Sodexo denies, that Butler raised the issue of "cultural differences between [ ] Asante and the employees at [ECHN MMH]." [*Id.* at ¶ 12].[1] No particular culture or cultural difference was identified. *Id.* Asante never reported this comment to anyone at Sodexo, but the record indicates that Farrell was aware of and "paraphras[ed]" Butler's comment to someone other than Asante. [Dkt. #62, D's Local Rule 56(a)(1) Statement at ¶ 55; Dkt. #66, P's Local Rule 56(a)(2) Statement at ¶ 55; Dkt. #68-3, Farrell Dep. at 125:25-126:7].

Among Asante's duties as General Manager at ECHN MMH was the implementation of a special dining program, known as "At Your Request" Dining. [Dkt. #63-2, P's Local Rule 56(a)(1) Statement at ¶ 11; Dkt. #68, D's Local Rule 56(a)(2) Statement at ¶ 11]. Asante and her team successfully implemented this program within seven months of her arrival. [*Id.*].

While serving as General Manager at ECHN MMH, Asante was paid less money than her predecessor, Rick Krolick ("Krolick"). [*Id.* at ¶ 14]. However, Sodexo asserts, and Asante does not dispute, that at the time he was serving as General Manager at ECHN MMH, Krolick had been an employee at Sodexo for many more years than Asante. [Dkt. #68, D's Local Rule 56(a)(2) Statement at ¶ 14]. In addition, Asante's compensation was within the posted salary range for her position. [Dkt. #62, D's Local Rule 56(a)(1) Statement at ¶ 61; Dkt. #66, P's Local Rule 56(a)(2) Statement at ¶ 61].

---

[1] According to Asante, Butler said that she "would have to train the ECHN management about different cultures so that they can accommodate somebody like you." [Dkt. #63-4, Asante Aff. at ¶ 12a.].

In June 2010, Asante and Farrell, who was her direct supervisor at Sodexo, had lunch together.  [Dkt. #62, D's Local Rule 56(a)(1) Statement at ¶¶ 6, 68; Dkt. #66, P's Local Rule 56(a)(2) Statement at ¶¶ 6, 68; Dkt. #68-3, Farrell Dep. at 146:3-6]. During this lunch, Asante alleges and Sodexo denies that Farrell told Asante a story about a "Jamaican woman" who worked at one of Sodexo's other client sites and whom the client wanted "removed."  [Dkt. #63-2, P's Local Rule 56(a)(1) Statement at ¶ 15; Dkt. #63-4, Asante Aff. at ¶ 12b; Dkt. #63-19, Asante Dep. at 110:17-22].  Farrell then allegedly told Asante that he advised the client that if they wanted to avoid a lawsuit, they should let Farrell "handle it."  [*Id.*].[2]  Asante does not assert the basis upon which a lawsuit might have been brought in that instance.  *Id.*  At that same lunch, Farrell told Asante about a documentary he had watched that involved a couple living in Alaska who tamed bears and were ultimately attacked and killed by the bears.  [Dkt. #63-2, P's Local Rule 56(a)(1) Statement at ¶ 16; Dkt. #68, D's Local Rule 56(a)(2) Statement at ¶ 16].  Asante claims, and Sodexo denies, that Farrell said the couple "worked really hard, but at the end of the man's hard work, the bears killed the man."  [*Id.*].   Farrell also purportedly said that his wife, with whom he was watching the documentary, asked Farrell, "why would the bears let the man do all that hard work before they killed him instead of killing him before all the hard work was done."  [*Id.*].  These two stories convinced Asante that Sodexo was going to try to "get rid of her" when she finished implementing the "At Your Request" program. [*Id.* at ¶ 17].

---

[2] Asante further claims that, at the time she heard this story, she believed Farrell was referring to her instead of an actual person, because a lot of people in America think she is Jamaican. *See* [Dkt. #63-4, Asante Aff. at ¶ 13].  She does not allege that Ferrell, her immediate supervisor, thought she was Jamaican. *Id.*

In or around July 2010, Farrell allegedly informed Asante that ECHN MMH "was shifting responsibilities around," and that Butler was going to become more involved in food service operations. [Dkt. #63-23, Farrell Dep. at 179:23; Dkt. #63-2, P's Local Rule 56(a)(1) Statement at ¶ 19; Dkt. #68, D's Local Rule 56(a)(2) Statement at ¶ 19]. Farrell also allegedly stated that Asante's title of General Manager was going to be given to Butler. [Dkt. #63-2, P's Local Rule 56(a)(1) Statement at ¶ 19; Dkt. #63-4, Asante Aff. at ¶ 12e; Dkt. #63-19, Asante Dep. at 117:17-118:09]. Right around this time, Asante claims that Farrell told her that he had "been in the business for [thirty] years and dirty politics can turn a hero into a zero in one day." [Dkt. #63-2, P's Local Rule 56(a)(1) Statement at ¶ 18; Dkt. #63-4, Asante Aff. at ¶¶ 12d., 14; Dkt. #63-19, Asante Dep. at 104:17-105:1]. According to Asante, this was the first time Farrell commented on "dirty politics," but thereafter, he used this phrase "often." [Dkt. #63-2, P's Local Rule 56(a)(1) Statement at ¶ 18]. Between this statement and Farrell's earlier statements about Butler's assumption of some of Asante's responsibilities, and possibly even her title, Asante "realized something was up and that [her] job was [ ] at risk." [Dkt. #63-4, Asante Aff. at ¶ 14]. However, Butler ultimately did not take over Asante's job title. [Dkt. #63-2, P's Local Rule 56(a)(1) Statement at ¶ 20; Dkt. #68, D's Local Rule 56(a)(2) Statement at ¶ 20].

In November 2010, after Asante requested a transfer from the ECHN MMH facility, Sodexo assigned her to a different ECHN facility, ECHN Woodlake. [*Id.* at ¶¶ 20, 22]. Asante was replaced at ECHN MMH by an interim General Manager, who was a white female between the age of 50 and 60, and later, by a permanent General Manager, who according to Plaintiff was a white male who was "younger," and who according to Defendant was a man in his 50s. [Dkt. #63-2, P's Local Rule 56(a)(1)

Statement at ¶ 20; Dkt. #68, D's Local Rule 56(a)(2) Statement at ¶ 20; Dkt. #68-5, Butler Dep. at 80:2-81:2].

Sodexo and ECHN Woodlake were parties to a "Management Agreement." [Dkt. #65-2]. Among other rights and obligations, the Management Agreement gave Sodexo "the exclusive right to manage and operate services for [ECHN Woodlake's] residents, employees, visitors, and guests." [*Id.* at ¶ 1.1]. Sodexo also agreed to provide the facility with two employees, a General Manager and a Clinical Nutrition Manager. [*Id.* at 10]. At the time of her transfer, Asante was to serve as the temporary General Manager, and her fellow Sodexo employee, Katie Lester ("Lester"), was working there as a Clinical Dietitian. [Dkt. #62-7, Lester Aff. at ¶ 4].

Asante asserts, and Sodexo denies, that Farrell and Karen Dutton ("Dutton"), a human resources senior manager at Sodexo, did not follow Sodexo's job posting protocols and procedures when Asante was transferred. [Dkt. #63-2, P's Local Rule 56(a)(1) Statement at ¶ 22]. Asante further contends that her new position at ECHN Woodlake constituted a demotion to "a troubled account" whose contract "was in jeopardy"; that both Dutton and Farrell knew this at the time they assigned her to ECHN Woodlake, as they were aware of a January 2010 report which concluded that Sodexo owed ECHN Woodlake $350,000; and that they did not inform Asante of this prior to her transfer. [*Id.* at ¶¶ 22–24].

Asante began working at ECHN Woodlake as the temporary General Manager in December 2010. [Dkt. #62, D's Local Rule 56(a)(1) Statement at ¶ 4; Dkt. #62-2, Asante Dep. at 151:2–6]. In this role, Asante was responsible for overseeing ECHN Woodlake's food and nutrition services department. [Dkt. #62, D's Local Rule

6

56(a)(1) Statement at ¶ 5; Dkt. #66, P's Local Rule 56(a)(2) Statement at ¶ 5].  The following month, on January 1, 2011, Asante received a letter informing her that she was to receive a 3% raise that would bring her base salary to $65,919.36, and that her overall job performance was rated as "Meets Expectations." [3]  [Dkt. #63-2, P's Local Rule 56(a)(1) Statement at ¶ 25; Dkt. #63-15 at 2].

In September 2011, Asante became the permanent General Manager at ECHN Woodlake.  [Dkt. #63-2, P's Local Rule 56(a)(1) Statement at ¶ 27; Dkt. #68, D's Local Rule 56(a)(2) Statement at ¶ 27].  Upon accepting this position, Asante signed an offer letter stating that she would be receiving a significant pay raise of $6,000, bringing her annualized compensation to $71,919.36.  [Dkt. #62-10].  The letter also stated that

> Sodexo does not offer employment on a fixed term basis, and the terms of this letter should not be construed in any manner as a proposed contract for any such term.  Both you and Sodexo may terminate employment at any time, for any reason, and with or without cause.

[*Id.* at 2; Dkt. #62, D's Local Rule 56(a)(1) Statement at ¶ 10; Dkt. #66, P's Local Rule 56(a)(2) Statement at ¶ 10].  Above the signature line on Asante's offer letter was the statement, "I have read, understand and agree to the terms and conditions of the foregoing document.  I understand that this is not an employment contract and that I am an employee at will."  [Dkt. #62-10 at 3; Dkt. #62, D's Local Rule 56(a)(1) Statement at ¶ 11; Dkt. #66, P's Local Rule 56(a)(2) Statement at ¶ 11].

---

[3] Asante received two performance reviews from Sodexo in 2010, one from Randall McKinnis, who gave her a "meets expectations" review, and one from Farrell, who gave her a "above expectations" review.  [Dkt. #68-2, Asante Dep. at 175:25-176:11].  The January 2011 compensation letter did not reference Farrell's more favorable review.

Each of the offer letters Asante signed with Sodexo, in 2008, 2010, and 2011, contained the quoted language above.  [Dkt. #62, D's Local Rule 56(a)(1) Statement at ¶¶ 10–11; Dkt. #66, P's Local Rule 56(a)(2) Statement at ¶¶ 10–11].  In addition, the March 2009 Sodexo Employee Handbook, which Asante acknowledged receiving, stated that the employment relationship between Sodexo and Asante was "terminable at any time[,] by either you or us, with or without cause and with or without notice.  The Handbook is not a contract of employment."  [*Id.* at ¶ 12].

For approximately her first six months at ECHN Woodlake, from December 2010 through July 2011, Asante did not have any issues with her ECHN Woodlake employees.  [Dkt. #62, D's Local Rule 56(a)(1) Statement at ¶ 26; Dkt. #66, P's Local Rule 56(a)(2) Statement at ¶ 26].  Thereafter, Asante claims that ECHN Woodlake employees harassed her in two ways.  First, several employees began to make a series of animal sounds in succession, which included monkey, cow, rhinoceros, and elephant sounds.  [Dkt. #63-2, P's Local Rule 56(a)(1) Statement at ¶ 28; Dkt. #62, D's Local Rule 56(a)(1) Statement at ¶¶ 31–32; Dkt. #66, P's Local Rule 56(a)(2) Statement at ¶¶ 31-32]. When making the animal sounds, the employees would say, for example, "how does the cow cry?  Moo, moo . . . How does the elephant cry? Bo, bo, bo."  [Dkt. #62, D's Local Rule 56(a)(1) Statement at ¶ 32; Dkt. #66, P's Local Rule 56(a)(2) Statement at ¶ 32].  Asante does not allege that anyone made reference to her while making, or in reference to making, these sounds, or while naming the animals they signified.  *Id.*  However, Asante believed that the cow, elephant, and rhinoceros noises were intended to make fun of her weight, and the monkey noise was intended to make fun of her race and national origin.  [Dkt. #62, D's Local Rule 56(a)(1) Statement at ¶ 36; Dkt. #66, P's Local Rule 56(a)(2) Statement at ¶ 36].

8

The ECHN Woodlake employees also mimicked a popular Planet Fitness commercial, which consisted of a very muscular and vapid Caucasian man with an Austrian accent, similar to Arnold Schwarzenegger's, who in response to anything said to or asked of him would intone the phrase, "I lift things up and put them down." [Dkt. #63-2, P's Local Rule 56(a)(1) Statement at ¶ 28; Dkt. #68, D's Local Rule 56(a)(2) Statement at ¶ 28; Dkt. #62, D's Local Rule 56(a)(1) Statement at ¶ 30; Dkt. #66, P's Local Rule 56(a)(2) Statement at ¶ 30]. Asante felt that the employees were "using her accent to imitate the Planet Fitness commercial" and were teasing her because she was of a different race, from a different country and spoke with a distinct accent. [Dkt. #66, P's Local Rule 56(a)(2) Statement at ¶ 41]. Asante does not allege that anyone made reference to her in relation to the commercial. In fact, the ECHN Woodlake employees made both the animal sounds and the Planet Fitness commercial imitations while they were on break, or when they were coming back from break or lunch, and Asante was in her office when she overheard them. [Dkt. #62, D's Local Rule 56(a)(1) Statement at ¶¶ 33–34, 42–43; Dkt. #66, P's Local Rule 56(a)(2) Statement at ¶¶ 33–34, 42–43]. A divider partially separated Asante's office from the room in which the employees were making these sounds and imitations. [Dkt. #62, D's Local Rule 56(a)(1) Statement at ¶ 42; Dkt. #66, P's Local Rule 56(a)(2) Statement at ¶ 42].

None of the individuals who made these sounds or imitations were Sodexo employees, nor is there any evidence that Asante ever reported them to Farrell, Dutton, or any other Sodexo employee. [*Id.* at ¶¶ 37–38].[4] Asante did, however,

---

[4] Asante contends that she "might" have told Farrell about the animal sounds, but she was "not sure." [Dkt. #65-3, Asante Dep., at 208:10–23].

9

report some of these incidents to Diane Morey ("Morey"), ECHN's HR Personnel director.  [Dkt. #68, D's Local Rule 56(a)(2) Statement at ¶ 29; Dkt. #62-20, P's Resps. & Objections to D's Interrog. No. 20, at 15–16; Dkt. #62-2, Asante Dep. at 192:22– 193:4, 196:1–4, 203:8–14, 208:24–209:2].[5]  The record also indicates that at the same time ECHN Woodlake employees were allegedly harassing Asante, they complained to Morey about Asante's management style, in particular Asante's requests that they not listen to music at certain times and that they not speak while preparing food plates.  [Dkt. #62, D's Local Rule 56(a)(1) Statement at ¶¶ 27–28; Dkt. #66, P's Local Rule 56(a)(2) Statement at ¶¶ 27–28; Dkt. #62-2, Asante Dep. at 204:5–206:14].

On November 9, 2011, Asante met with Morey and Belanger, who told Asante that she was making ECHN Woodlake employees feel insecure.  [Dkt. #62, D's Local Rule 56(a)(1) Statement at ¶ 29; Dkt. #66, P's Local Rule 56(a)(2) Statement at ¶ 29].  Asante also claims, and Sodexo denies, that at this meeting Asante again reported that ECHN Woodlake employees were teasing and making fun of her.  [Dkt. #66, P's Local Rule 56(a)(2) Statement at ¶ 29].  A few days later, Farrell gave Asante a letter, dated November 10, 2011, informing her that she was being removed from her position as General Manager at ECHN Woodlake, effective November 14, 2011.  [Dkt. #62-14].  The letter stated that "Sodexo's contract at Woodlake will be ending by year end.  During the course of this transition the client has requested your removal for not meeting her expectations."  [*Id*. at 2].  The letter also stated that Asante would "remain a Sodexo employee through December 30, 2011" and that she may

---

[5] Asante also maintains that she reported them to ECHN Woodlake Administrator, Ellen Belanger ("Belanger").  [Dkt. #63-2, P's Local Rule 56(a)(1) Statement at ¶ 29].

"actively post to other Sodexo positions" for which she was qualified.  [*Id.*].  On the other hand, the letter referenced Asante's "termination" at multiple points and informed her that "any benefits" for which she was enrolled "will cease on the date of [he]r termination."  [*Id.*].[6]  When Farrell met with Asante to give her the letter, he told her that Belanger was the one who had requested her removal for failing to meet expectations.  [Dkt. #63-2, P's Local Rule 56(a)(1) Statement at ¶ 36; Dkt. #68, D's Local Rule 56(a)(2) Statement at ¶ 36].  According to Asante, Farrell also asked for the password to her computer, and following her departure from the facility that day, her remaining personal items were discarded.  [Dkt. #66, P's Local Rule 56(a)(2) Statement at ¶¶ 47–48].  Asante claims that she understood from "Farrell's tone" that she "was required to leave [the building] immediately."  [Dkt. #66, P's Local Rule 56(a)(2) Statement at ¶ 48].  However, she does not assert that she was told that she could not retrieve her personal belongings before departing.

The ECHN Woodlake–Sodexo contract was terminated on December 15, 2011.  [Dkt. #63-18 at 1].[7]  As a result, Asante's colleague at ECHN Woodlake, Lester, lost her position and, like Asante, had to look for alternative positions within Sodexo.

---

[6] The substance of this letter was written by Dutton in a November 10, 2011 email.  This email included the statement that "the client requested her removal for not meeting *his* expectations."  [Dkt. #63-2, P's Local Rule 56(a)(1) Statement at ¶ 31; Dkt. #68, D's Local Rule 56(a)(1) Statement at ¶ 31; Dkt. #63-5 at 2 (emphasis added)].

[7] Asante contends that the contract "was terminated on November 15, 2011," but she does not cite to any evidence to support her claim.  [Dkt. #63-2, P's Local Rule 56(a)(1) Statement at ¶ 34].  This alone precludes consideration of her assertion.  *See* Local Rule 56(a)(3).  In addition, it appears Asante derived this incorrect date from the November 15, 2011 letter Belanger sent to Sodexo Division Vice President, John Hutsell.  [Dkt. #63-18].  While the letter is dated November 15, 2011, it clearly states that its purpose was to provide Sodexo with a "30 day written notice of termination," which was to take effect "as of December 15, 2011."  [*Id.*].

[Dkt. #62, D's Local Rule 56(a)(1) Statement at ¶ 21; Dkt. #66, P's Local Rule 56(a)(2) Statement at ¶ 21].  Asante claims that she was treated differently than Lester, as Lester received assistance from Sodexo in obtaining a new placement.  [Dkt. #66, P's Local Rule 56(a)(2) Statement at ¶ 21].  By contrast, Asante was unable to secure another position within Sodexo by December 30, 2011, and she was officially terminated the following day, on December 31, 2011.  [Dkt. #62, D's Local Rule 56(a)(1) Statement at ¶ 49; Dkt. #66, P's Local Rule 56(a)(2) Statement at ¶ 49].

Following her termination, on April 23, 2012, Asante filed a discrimination charge with both the Connecticut Commission on Human Rights and Opportunities and the Equal Employment Opportunity Commission.  [Dkt. #62, D's Local Rule 56(a)(1) Statement at ¶ 50; Dkt. #66, P's Local Rule 56(a)(2) Statement at ¶ 50].  On March 11, 2013, she filed her initial complaint in this matter.  [*Id.*].  The original complaint named both Sodexo and ECHN as defendants.  *See* [Dkt. # 1, Compl. at 4–7].  However, on August 20, 2013, Asante dismissed the complaint as to ECHN, *see* [Dkt. #29], and on December 18, 2013, she filed an amended complaint.  *See* [Dkt. #40].  On May 1, 2014, the parties submitted cross-motions for summary judgment.  *See* [Dkts. # 60, 63].

   III.   <u>Legal Standard</u>

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the burden of proving that no factual issues exist.  *Vivenzio v. City of Syracuse,* 611 F.3d 98, 106 (2d Cir. 2010).  "In determining whether that burden has been met, the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor

of the party against whom summary judgment is sought." *Id.* (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Electric Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L.Ed.2d 538 (1986)).  "If there is any evidence in the record that could reasonably support a jury's verdict for the nonmoving party, summary judgment must be denied." *Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH,* 446 F.3d 313, 315–16 (2d Cir. 2006) (internal quotation marks and citation omitted). In addition, determinations of the weight to accord evidence or assessments of the credibility of witnesses are improper on a motion for summary judgment, as such are within the sole province of the jury. *Hayes v. New York City Dep't of Corr.*, 84 F. 3d 614, 619 (2d Cir. 1996).

"A party opposing summary judgment cannot defeat the motion by relying on the allegations in his pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible.  At the summary judgment stage of the proceeding, Plaintiffs are required to present admissible evidence in support of their allegations; allegations alone, without evidence to back them up, are not sufficient." *Welch–Rubin v. Sandals Corp.,* No. 3:03-cv-481, 2004 WL 2472280, at *1 (D. Conn. Oct. 20, 2004) (internal quotation marks and citations omitted); *Martinez v. State of Connecticut*, 817 F. Supp. 2d 28, 37 (D. Conn 2011). Where there is no evidence upon which a jury could properly proceed to find a verdict for the party producing it and upon whom the onus of proof is imposed, such as where the evidence offered consists of conclusory assertions without further support in the record, summary judgment may lie. *Fincher v. Depository Trust and Clearance Co.*, 604 F.3d 712, 727 (2d Cir. 2010).

13

IV.   **Analysis**

a.   **Sodexo is Entitled to Summary Judgment on Asante's Title VII Discrimination Claims**

Asante alleges that Sodexo unlawfully discriminated against her on the basis of her age, gender, race, and national origin, and in so doing, violated Title VII.  Title VII prohibits an employer from discriminating against any individual with respect to "compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin."  42 U.S.C. § 2000e-2(a)(1). Title VII discrimination claims are analyzed under the burden-shifting rules of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04, (1973).  *See, e.g., Bucalo v. Shelter Island Union Free Sch. Dist.*, 691 F.3d 119, 128 (2d Cir. 2012).  Under the *McDonnell Douglas* framework, a plaintiff must set out a *prima facie* case of discrimination by demonstrating that: "(1) she was within the protected class; (2) she was qualified for the position; (3) she was subject to an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination."  *U.S. v. Brennan*, 650 F.3d 65, 93 (2d Cir. 2011).  Once the plaintiff has met its initial burden of setting out a prima facie discrimination case, he "is then aided by a presumption of discrimination unless the defendant proffers a legitimate, nondiscriminatory reason for the adverse employment action, in which event, the presumption evaporates and the plaintiff must prove that the employer's proffered reason was a pretext for discrimination."  *Goins v. Bridgeport Hosp.*, 555 F. App'x 70, 73 (2d Cir. 2014) (citation and internal quotation omitted).

1.   **Asante Advances One Timely Material Adverse Employment Action**

In order to rise to the level of an adverse employment action under federal discrimination laws, the employment action must be "tangible" or "material." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998).  "A tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."  *Id*.  Materially adverse employment actions also include "a demotion evidenced by a decrease in wage or salary, a less distinguished title, . . . or other indices . . . unique to a particular situation."  *Feingold v. New York*, 366 F.3d 138, 152 (2d Cir. 2004) (citations and internal quotations omitted).  However, a "bruised ego," a "demotion without change in pay, benefits, duties, or prestige," or "reassignment to [a] more inconvenient job" are all insufficient to constitute a tangible or materially adverse employment action.  *See Ellerth*, 524 U.S. at 761.

Asante offers one timely adverse employment action upon which to base her *prima facie* case: Sodexo's decision not to reassign and to instead terminate her after she was removed from her position as General Manager at ECHN Woodlake. *See Brown v. Connecticut*, No. 3:08-cv-1478 (MRK), 2010 WL 2220580, at *6 (D. Conn. May 27, 2010) (rejecting defendant's argument that its "failure to retain [the plaintiff] in some capacity" did not constitute an adverse employment action); *Khan v. Hilton Worldwide, Inc.*, No. 14 Civ. 1011 (ALC), 2015 WL 738108, at *4 (S.D.N.Y. Feb. 20, 2015) ("It is clear that an employer's failure to rehire an employee qualifies as an adverse employment action under Title VII.").

The other adverse employment actions Asante raises are either time-barred, legally insufficient, or both.  For example, Asante claims she suffered an adverse

employment action when she was transferred to a "troubled account" whose "contract was in jeopardy."  [Dkt. #63-2, P's Local Rule 56(a)(1) Statement at ¶ 23]. An assignment to a troubled account may rise to the level of an adverse employment action to the extent that it is "materially less conducive to career advancement."  *Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 641 (2d Cir. 2000).  Given Sodexo's requirement that, following the termination of a contract with a client, the employees stationed at the client must apply for reassignment within Sodexo or suffer termination, a transfer to an account that Sodexo employees reasonably anticipated would end in the foreseeable future would likely constitute an adverse employment action.

However, Asante's transfer to ECHN Woodlake is not an actionable adverse employment action for at least two reasons.  First, Asante may not rely upon the transfer to support her discrimination claim because it occurred more than 300 days before she filed her EEOC complaint.  *Morgan v. Nat'l R.R. Passenger Corp.*, 536 U.S. 101, 113 (2002) ("[D]iscrete discriminatory acts are not actionable if time barred . . . . Because each discrete discriminatory act starts a new clock for filing charges alleging that act, the charge must be filed within the 180– or 300–day time period after the discrete discriminatory act occurred.").  *See also* [Dkt. #62, D's Local Rule 56(a)(1) Statement at ¶ 50; Dkt. #66, P's Local Rule 56(a)(2) Statement at ¶ 50]. Second, and more importantly, Asante does not offer evidence that Farrell or Dutton were aware that ECHN Woodlake intended to terminate its contract with Sodexo in December 2010, when Asante began working there.  At most, Farrell's deposition testimony, on which Asante relies, establishes that before she was transferred, Farrell (i) prepared an internal ethics report in January 2010 stating that Sodexo

**16**

improperly retained $350,000 under its contract with ECHN Woodlake and (ii) directly informed the president of Sodexo's Health Care Division of this.  *See* [Dkt. #63-23, Farrell Dep. at 106:21–108:25].  Farrell also testified that, at some point, he "informed the customer of the irregularity."  [*Id.* at 109:8–9].  Thus, it is unclear when ECHN Woodlake became aware of the issue (*i.e.* whether it was before, after, or around the time of Asante's transfer), and neither Farrell's testimony nor any other evidence in the record establishes a link between this payment discrepancy (first raised in early 2010) and ECHN Woodlake's decision to cancel the parties' agreement in November 2011.  In fact, Belanger, the ECHN Woodlake employee who made the decision to terminate the contract with Sodexo, testified that the decision was not because Sodexo had not "done right by me . . . . It just wasn't something the building could afford anymore.  That was all it was."  [Dkt. #68-4, Belanger Dep. at 145:3–5].

Asante raises two other potential adverse employment actions, each of which is legally insufficient.  First, Asante's alleged demotion when she was transferred to ECHN Woodlake from a GM-4 to a GM-3 is not a legally cognizable adverse employment action because, at most, it constituted a "demotion without change in pay, duties, or prestige."  *Ellerth*, 524 U.S. at 761.  Asante offers no facts establishing that this change in management level materially and adversely changed the terms and conditions of her employment.  In fact, the record indicates that she was paid *more* when she was a GM-3 at ECHN Woodlake than when she was a GM-4 at ECHN MMH.  *See* [Dkt. #63-15 at 2; Dkt. #62-10].

Similarly, Asante's disparate pay claim fails because she does not offer evidence showing that she and her predecessor, Krolick, were "similarly situated in

all material respects." *Humphries v. City Univ. of New York*, No. 13 Civ. 2641, 2013 WL 6196561, at \*6 (S.D.N.Y. Nov. 26, 2013) (citing *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2001)).  Asante offers only the facts that she "held the same position with the same title" as Krolick.  [Dkt. #62, D's Local Rule 56(a)(1) Statement at ¶ 59; Dkt. #66, P's Local Rule 56(a)(2) Statement at ¶ 59].  This is plainly insufficient to establish a disparate pay claim.  *See Joseph v. Owens & Minor Distrib., Inc.*, 5 F. Supp. 3d 295, 312 (E.D.N.Y. 2014) (finding plaintiff failed to establish a *prima facie* case of discrimination when he asserted "only that the two comparators shared the same job title as him, but offer[ed] no additional evidence that they were similarly situated in terms of performance, evaluation or discipline standards, or that they engaged in comparable conduct.").  Moreover, Sodexo asserts, and Asante does not dispute, that at the time Asante was hired as General Manager at ECHN MMH, Krolick had *over twenty more years* of seniority at Sodexo.  [Dkt. #68, D's Local Rule 56(a)(2) Statement at ¶ 14]; *see Trotman v. CBS Radio Inc.*, No. 06 Civ. 3389 (FM), 2007 WL 2827803, at \*9 (S.D.N.Y. Sept. 27, 2007) ("Among the factors to be considered in determining whether employees are similarly situated are their specific duties, education, *seniority*, and performance history") (citations and quotations omitted) (emphasis added); *Bright v. Coca Cola Refreshments USA, Inc.*, No. 12 Civ. 234 (BMC), 2014 WL 5587349, at \*27 (E.D.N.Y. Nov. 3, 2014) (concluding that two workers were "not similarly situated in all respects because the parties agree that [the allegedly comparable worker] had *ten years* more seniority than [the plaintiff]") (emphasis in original). Based on the totality of these facts, Asante and her comparator are not similarly situated.

2.  <u>Asante Fails To Establish Circumstances Permitting For an Inference of Discrimination</u>

i.    <u>The remarks, sounds, and imitations made by ECHN employees are insufficient to raise an inference of discriminatory intent</u>.

Asante principally relies on two sets of comments and remarks to support her discrimination claims: (i) comments made by Sodexo employees, or about which Sodexo employees had knowledge[8] and (ii) comments made by employees of ECHN and with no evidence that anyone at Sodexo was aware of them.

The first set of comments includes the statement by Butler during Asante's March 2010 interview that Butler "would have to train the ECHN management about different cultures so that they can accommodate somebody like [Asante]"; the stories Farrell told Asante at a lunch in June 2010 about the "Jamaican woman" and the bear documentary; Farrell's use of the phrase "dirty politics can turn a hero into a zero in one day"; and Farrell's statement to Asante that Butler would be taking Asante's job title and some of her job responsibilities.  [Dkt. #63-2, P's Local Rule 56(a)(1) Statement at ¶¶ 15–19].

---

[8] As Sodexo acknowledges in the hostile work environment context [Dkt. #61 at 29–30], an employer may be liable for a non-employee's bad conduct when the employer "knew of the non-employee conduct, did nothing about it and the employer exerted control or had other legal responsibility over the non-employee." *Lewis v. Univ. of Conn. Health Ctr., Corr. Managed Health Care*, No. 3:11cv821 (VLB), 2011 WL 5245423, at *4 (D. Conn. Nov. 2, 2011).  The same is true with regard to discriminatory conduct in violation of Title VII.  *See Goodman v. Port Auth. of N.Y. & N.J.*, 850 F. Supp. 2d 363, 386–87 (S.D.N.Y. 2012) (considering "[c]laims of employment discrimination under the NYSHRL and NYCHRL [which] are analyzed under the same *McDonnell Douglas* [framework] applied to Title VII" and stating that "an employer may be found liable for the conduct of non-employees in certain instances . . . . According to the EEOC Guidelines, an employer may be held responsible for the acts of non-employees with respect to discrimination in the workplace, where the employer (or its agents or supervisory employees) knows or should have known of the conduct and fails to take immediate or corrective action.") (citations and quotations omitted).

As an initial matter, Sodexo, relying on *Morgan v. Nat'l R.R. Passenger Corp.*, argues that each of these statements is time-barred and should be disregarded in evaluating [Asante's] claims."  [Dkt. #61 at 23].  Sodexo is correct that these allegations occurred prior to June 28, 2011—300 days before Asante filed her EEOC claim.  *See* [Dkt. #62, D's Local Rule 56(a)(1) Statement at ¶ 50; Dkt. #66, P's Local Rule 56(a)(2) Statement at ¶ 50].  In response, Asante raises the continuing violations exception to support consideration of these untimely statements.  *See* [Dkt. #65 at 12–13].  The continuing violations exception "extends the limitations period for all claims of discriminatory acts committed under an ongoing policy of discrimination even if those acts, standing alone, would have been barred by the statute of limitations."  *Annis v. Cnty. of Westchester*, 136 F.3d 239, 246 (2d Cir. 1998).  However, "[i]t is well-established that the 'continuing violation' doctrine cannot save untimely claims for discrete discriminatory acts, even where those acts are related to acts within the limitations period."  *Bright v. Coca Cola Refreshments USA, Inc.*, No. 12 Civ. 234 (BMC), 2014 WL 5587349, at *4 (E.D.N.Y. Nov. 3, 2014).  The untimely remarks Asante seeks to rely on here bear no obvious relation to one another, and they therefore constitute discrete acts, rendering the exception inapplicable.

This does not, however, end the inquiry.  While Sodexo is correct that these statements are time-barred, its conclusion that the Court must disregard them is not.  The *Morgan* Court expressly held that an employee is not barred "from using prior acts as background evidence in support of a timely claim."  *Morgan*, 536 U.S. at 113.  Accordingly, the Court will consider the untimely acts Asante raises to the extent they provide background evidence in support of her timely claim of wrongful

termination.  *See, e.g., Brown v. AstraZeneca Pharm., L.P.,* No. CV-03-6166 (DGT), 2006 WL 2376380, at *6 (E.D.N.Y. Aug. 16, 2006) (stating that plaintiff was "entitled to use untimely facts as background evidence in support [of] his timely Title VII claim").[9]

The first in time (and most serious) comment Asante raises is Butler's March 2010 statement.[10]  Citing to her affidavit, Asante states:

> During my initial one-on-one meeting with Elizabeth (Liz) Butler she told me that she 'would have to train the ECHN management about different cultures so that they can accommodate somebody like you" (referring to me) . . . Ms. Butler's statement . . . about my different 'culture' was discriminatory to me because I had just arrived at my new position, had not been given a chance to prove myself, and I felt I was already starting off on the wrong foot because of my African culture.

[Dkt. #63-4, Asante Aff. at ¶¶ 12-13].  Asante may well have viewed Butler's statement as discriminatory, and Butler's reference to "different cultures" *could* have concerned any or all of the protected classes to which Asante belongs, but without more, the statement is ambiguous.  As Asante acknowledged, she had just left a Sodexo job site at AEGON USA Realty, which was located in Cedar Rapids, Iowa, and was interviewing for a position at a health services company in Manchester, Connecticut.  Given the significant differences between the two positions in terms of both geography and industry, it is plausible that a reference to

---

[9] In addition, the *Morgan* Court made clear "that the time bar does not apply to hostile workplace claims."  *Robles v. Argonaut Rest. & Diner*, No. 05 CV 5553 (JSR), 2009 WL 3320858, at *9 n. 8 (S.D.N.Y. Oct. 9, 2009) (citing and quoting *Morgan*).  Accordingly, in assessing Asante's hostile work environment claim, the Court considers all of the otherwise time-barred comments and Asante's transfer to ECHN Woodlake.

[10] Asante contends, and offers evidence to support her claim, that Farrell was aware of Butler's comment.  [Dkt. #63-2, P's Local Rule 56(a)(1) Statement at ¶ 13; Dkt. #63-23, Farrell Dep. at 126:1–24].

"different cultures" could have concerned these non-discriminatory differences. *See Nurse v. Lutheran Med. Ctr.*, 854 F. Supp. 2d 300, 316–17 (E.D.N.Y. 2012) (declining to find discriminatory animus based on national origin where the defendant had not "said anything about plaintiff's national origin," and where the allegedly discriminatory phrase lacked any obvious connection to the plaintiff's national origin); *see also Agrawal v. Monemagno*, 574 F. App'x 570, 576 (6th Cir. 2014) (affirming district court's conclusion that a "remark alluding to a 'cultural divide'" was insufficient to serve as evidence of national origin or race discrimination because "this statement could be interpreted several ways"); *Espinoza v. Dep't of Corr.*, 509 F. App'x 724, 734 (10th Cir. 2013) (finding defendant's "acknowledg[ment] that cultural differences existed" insufficient to establish discriminatory intent where the plaintiff "did not present evidence on what [the defendant] meant by this statement, develop a factual record to demonstrate what the differences were, or explain how this comment established a basis for his belief of discrimination in this instance").

In addition, while Asante's subjective belief that this statement was discriminatory is relevant, "[a] plaintiff's speculations, generalities, and gut feelings, however genuine, when they are not supported by specific facts, do not allow for an inference of discrimination to be drawn."  *Whethers v. Nassau Health Care Corp.*, 956 F. Supp. 2d 364, 379 (E.D.N.Y. 2013) (internal quotations and citation omitted). Instead, her belief "must be reasonable and characterized by *objective* good faith." *Johnson v. City Univ. of N.Y.*, No. 14-CV-587 (VEC), 2014 WL 4412475, at *4 (S.D.N.Y. Sept. 8, 2014) (quoting *Kelly v. Howard I. Shapiro & Assocs. Consulting Eng'rs, P.C.*, 716 F.3d 10, 16 (2d Cir. 2013) (emphasis in original)).  Asante simply offers no facts,

other than the ambiguous statement itself, to support her subjective belief that the statement was discriminatory and was intended as such.

Like Butler's comment regarding cultural differences, none of Farrell's statements raise an inference of discriminatory intent, as their connection to any of the protected classes to which Asante belongs is "far too attenuated." *Nurse*, 854 F. Supp. 2d at 317.  Farrell's story about the bear documentary, and his statements about dirty politics and Butler's alleged assumption of Asante's job title and responsibilities, are all facially neutral and "would require a chain of inferences, for which there is no support in the record, to conclude that the remark[s] reflected [discriminatory] animus." *Hayes v. Cablevision Sys. N.Y. City Corp.*, No. 07-CV-2438 (RRM), 2012 WL 1106850, at *10 (E.D.N.Y. Mar. 31, 2012).  Indeed, even the story regarding the "Jamaican woman," which does touch upon national origin, is insufficient, since Asante was not Jamaican.  [Dkt. #63-4, Asante Aff. at ¶ 13].  *See, e.g., Ramirez v. United Parcel Serv.*, No. 06-1042, 2010 WL 1994800, at *4 (D.N.J. May 17, 2010) (concluding that evidence of "discrimination against persons of different races or national origin than [p]laintiff will not be admissible" because "[t]here must be a causal nexus between the discriminatory conduct and [p]laintiff's . . . background").  Moreover, reference to the Jamaican heritage of the other employee was not ethnically derogatory.  Asante claims that she was nevertheless "intimidated" by the story because she believed Farrell "was referring to [her] instead of an actual person because a lot of people in America think [Asante is] Jamaican," and because she viewed this story, in tandem with Farrell's story about the bear documentary, as "send[ing] [a] message that ECHN wanted to get rid of [her] but that [Farrell] would try to 'handle it.'"  [Dkt. #63-4, Asante Aff. at ¶ 13].

However, without any additional facts or context, it would require a series of logical leaps to construe Farrell's statements in the manner Asante apparently has.  The only evidence Asante offers to substantiate either of these interpretations fails to provide any support.  Asante suggests that Sodexo's statement that it had no responsive documents "relating to, or in any way pertaining to the filing of [a] discrimination charge"  by the Jamaican woman who was allegedly the subject of Farrell's story somehow proves Asante's conclusion that such a woman never existed.  [Dkt. #63-1 at 15].  This is incorrect on a number of levels.  Sodexo responded to this request years after Farrell allegedly told the "Jamaican woman" story, and the response does not concern any evidence available to Asante at the time she reached her entirely unsupported inference.  Therefore, Sodexo's response does not provide any support for the reasonableness of Asante's assumption at that time.  Furthermore, the absence of documents relating to the filing of a discrimination charge years earlier in no way shows that Farrell conjured up a person out of thin air, as Asante asserts.

Finally, Butler's and Farrell's remarks are "too remote in time and context to support a reasonable inference" that Sodexo's decision not to reassign and to terminate Asante was the result of any discriminatory intent.  *Hasemann v. United Parcel Serv. of Am., Inc.*, No. 3:11-cv-554 (VLB), 2013 WL 696424, at *8 (D. Conn. Feb. 26, 2013) (finding that "[i]n the absence of a nexus between time, place and context" of the allegedly discriminatory remark and the ultimate decision to terminate the plaintiff, a comment which could be construed as relating to the plaintiff's age was merely a non-actionable "stray remark").  The latest of these comments, made by Farrell regarding Butler's assumption of Asante's job title and some of her job

responsibilities, allegedly occurred in July 2010.  [Dkt. #63-2, P's Local Rule 56(a)(1)

Statement at ¶ 19; Dkt. #68, D's Local Rule 56(a)(2) Statement at ¶ 19].  Sodexo's

removal of Asante from her position as General Manager at ECHN Woodlake was

effective on November 14, 2011, nearly one-and-a-half years later.  [Dkt. #62-14].

This significant gap in time between Farrell's statements and Sodexo's decision not

to reassign and to terminate Asante renders them too remote in time to support a

rational inference of discriminatory intent.  *See Almonord v. Kingsbrook Jewish*

*Med. Ctr.*, No. 04-CV-4071 (NGG), 2007 WL 2324961, at *9 (E.D.N.Y. Aug. 10, 2007)

(holding that comment made at least five months before plaintiff's termination was

"not sufficient to create an inference of discrimination"); *Ezold v. Wolf, Block,*

*Schorr & Solis-Cohen*, 983 F.2d 509, 545 (3d Cir. 1992) ("Stray remarks by . . .

decisionmakers unrelated to the decision process are rarely given great weight,

particularly if they were made temporally remote from the date of the decision.").

Asante's second set of comments and remarks, those made by ECHN

Woodlake employees regarding a Planet Fitness commercial and animal noises

within earshot of Asante, similarly fail to raise an inference of discriminatory

intent.[11]

---

[11] Sodexo contends that these statements are legally insufficient because "there is no link between these incidents and either Farrell or Dutton, the decision-makers" at Sodexo.  [Dkt. #61 at 22].  However, this argument overlooks the possibility of liability under a "cat's paw" theory of employment discrimination.  *See Hasemann*, 2013 WL 696424, at **10–11 (citing and discussing *Staub v. Proctor Hosp.*, 562 U.S. 411 (2011)).  In a "cat's paw" case, a plaintiff typically seeks to hold her employer liable for the animus of a supervisor who lacked decision-making authority by showing that the supervisor performed an act motivated by discriminatory animus that was intended by the supervisor to cause an adverse employment action, and the act was a proximate cause of the ultimate employment action.  *Id.* at *10.  Here, Asante claims that she reported the animal sounds and commercial imitations to ECHN Administrator Belanger on several occasions.  [Dkt. #63-2, P's Local Rule 56(a)(1) Statement at ¶ 29; Dkt. #63-4, Asante Aff. at ¶ 20].  Belanger was the ECHN

Asante asserts that following her first six months at ECHN Woodlake, the employees she managed began to make animal sounds, including those of a monkey, cow, rhinoceros and elephant, and they mimicked a popular Planet Fitness commercial, which consisted of a Caucasian male with an Austrian accent, like Arnold Schwarzenegger's, repeatedly saying, "I lift things up and put them down." [Dkt. #63-2, P's Local Rule 56(a)(1) Statement at ¶ 28]. Asante believed that some of these noises were intended to make fun of her weight, while the monkey noise concerned her race and national origin. [Dkt. #62, D's Local Rule 56(a)(1) Statement at ¶ 36; Dkt. #66, P's Local Rule 56(a)(2) Statement at ¶ 36]. As an initial matter, while certainly unpleasant, comments or remarks regarding a person's weight are not actionable under Title VII. *See Bill v. City of North Lauderdale*, No. 12-61342-CIV, 2013 WL 1289165, at *2 (S.D. Fla. Mar. 26, 2013) ("Obese individuals are not a protected class under Title VII.") (citing *Armstrong v. City of Dallas*, 997 F.2d 62, 67 n. 19 (5th Cir. 1993) and *Taylor v. Small*, 350 F.3d 1286, 1292 (D.C. Cir. 2003)). Monkey noises directed at or about Asante, in light of her race and national origin, would be sufficient to support a *prima facie* case of discrimination. *See Jackson v.*

---

Woodlake employee who requested Asante's removal from ECHN Woodlake for not meeting her expectations. [Dkt. #63-2, P's Local Rule 56(a)(1) Statement at ¶ 36; Dkt. #68, D's Local Rule 56(a)(1) Statement at ¶ 36]. If Asante were to prove that Belanger was aware of discriminatory conduct and did nothing about it, she may be able to establish that Belanger acted with discriminatory animus when she requested her removal. *See, e.g., Malcom v. Honeoye Falls-Lima Educ. Ass'n*, 678 F. Supp. 2d 100, 105–06 (W.D.N.Y. 2010) (finding plaintiff stated a Title VII discrimination claim where she alleged that "she made defendants aware of alleged discriminatory conduct" by third-party school district and the defendants subsequently provided her with fewer resources and less support than they did or would have done for non-minority members). To the extent that Belanger removed Asante with discriminatory animus and, based on this removal, Sodexo decided not to reassign and to terminate Asante, Sodexo would be liable. However, given Asante's failure to put forth sufficient evidence of discriminatory intent as to *either* the ECHN Woodlake employees or Belanger, no such liability attaches here.

*Health Res. of Rockville, Inc.*, 357 F. Supp. 2d 507, 515 (D. Conn. 2005).  However, the context in which they were made here thoroughly undermines any inference of discriminatory intent, as Asante cites no facts to support her suspicion that these comments were directed toward her.  In the same vein, and for the same reasons, Asante's complaint about the Planet Fitness commercial imitations fails to raise such an inference.

As Asante acknowledges, neither the commercial imitations nor the animal sounds were ever made in her presence.  *See Whethers*, 956 F. Supp. 2d at 380 (declining to infer racial animus "where the statement was not made to the plaintiff, but to her supervisor").  Instead, the ECHN Woodlake employees made these noises while they were on or returning from break and when Asante was in her office, which was partially partitioned off by a divider.  [Dkt. #62, D's Local Rule 56(a)(1) Statement at ¶¶ 33-34; Dkt. #66, P's Local Rule 56(a)(2) Statement at ¶¶ 33-34].

Moreover, the noises and words the employees used provide no indication that they concerned Asante, let alone a suggestion that they targeted any of the protected classes to which Asante belonged.  *See Cartagena v. Ogden Servs. Corp.*, 995 F. Supp. 459, 463 (S.D.N.Y. 1998) (discussing two Second Circuit decisions, *Woroski v. Nashua Corp.*, 31 F.3d 105 (2d Cir. 1994), *abrogated on other grounds by Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000), and *Renz v. Grey Advertising, Inc.*, 135 F.3d 217 (2d Cir. 1997), which upheld grants of summary judgment where discriminatory comments were made, but in one case "the remarks were not made to the plaintiffs" and in the other there was "no evidence of remarks directed at the plaintiff or in connection with her discharge"); *Velez v. McHugh*, No. 09 Civ. 0925 (GAY), 2011 WL 778693, at *5 (S.D.N.Y. Mar. 2, 2011) (finding that there

27

was "an insufficient nexus between" a panel member's occasional racially offensive comments to a different person "and the adverse action [p]laintiff complains of" where the "comments were not made to [p]laintiff, were not in reference to [p]laintiff, and did not relate to the [adverse employment action]").  As Sodexo points out, the animal noises were all made at the same time, and Asante admitted that only the monkey noise could possibly have concerned any protected class.  [Dkt. #62-2, Asante Dep. at 202:16-203:6].  Similarly, the accent the employees were mimicking was an Austrian accent modeled off of Arnold Schwartzenegger, a Caucasian male, and the phrase "I lift things up and put them down" is facially neutral and does not appear to have any relationship to Asante.  The fact that both Asante and the character in the commercial both have *an* accent is not sufficient.  Without more, Asante's inference that the employees were "using *her* accent to imitate the Planet Fitness commercial" is baseless.  [Dkt. #66, P's Local Rule 56(a)(2) Statement at ¶ 41 (emphasis added)].

Asante offers little evidence, direct or indirect, beyond her own subjective belief and unsubstantiated inferences, that these noises and imitations were made to or about her, and no evidence that they concerned one or more of the protected classes to which Asante belonged, or that there was any nexus between these noises and the adverse employment action she suffered.  Most telling is Asante's deposition testimony, in which she explained how she came to the conclusion that the imitations and noises were directed at her:

> Q: Why do you think [the imitations and noises were] directed at you versus joking around?
>
> A: I called them.  I called one of them one day.
>
> Q: Who?

**28**

**A: Saima Dode and I asked her what do you mean by that animal noises and that accent.  She couldn't speak for a while because she didn't know what to say.  Because they were making the noise . . .**

**Q: [Y]ou said that you called Saima Dode over and you asked her what do you mean by those noises?**

**A: Animals.  And then she couldn't say anything.  And then I said you have to answer me, otherwise I'm taking discipline action.  Then she look[ed] at me and said oh, we were just trying to be silly.  And I asked her, silly about what?  Silly about what?  She couldn't talk.  Then she started shivering.  But it was time for lunch and she needed to go prepare the lunch.**

[Dkt. #62-2, Asante Dep. at 192:18-25, 193:11-21].  At most, the employee's silence and shivering allows for the inference that these noises and imitations were made to disparage Asante in some way.[12]  However, nowhere in her description does Asante offer any evidence that they concerned her protected status.  *See Hoey v. Potter*, No. 3:03-cv-00713 (AWT), 2005 WL 734495, at **3–4 (D. Conn. 2005) (holding that "lewd and obscene gestures and disparaging comments" failed to "support a reasonable inference" that they were due to the plaintiff's disability where one statement *could* have concerned plaintiff's disability but this conclusion was "based solely upon the plaintiff's speculation" and the plaintiff  failed to "link the other alleged incidents of harassment to her disability").[13]  This absence of evidence is particularly striking in light of the evidence that, at the same time these employees

---

[12] But even this inference is tenuous, as it is equally plausible that an employee who is being reprimanded by her manager for unprofessional conduct might well react in a similarly quiet and nervous manner.

[13] In addition, Asante fails to offer evidence of any connection between these animal noises and imitations, and Butler's and Farrell's earlier, untimely, comments.  *See McGallum v. Cedar Graphics, Inc.*, 609 F.3d 70, 77–78 (2d Cir. 2010) (finding that offensive comments plaintiff heard in a different department of her office a year apart were not sufficiently related to apply the continuing violation doctrine).

were making animal noises and imitations, they were lodging complaints with ECHN Human Resources Director Morey regarding Asante's management decisions.  [Dkt. #62, D's Local Rule 56(a)(1) Statement at ¶¶ 27-28; Dkt. #66, P's Local Rule 56(a)(2) Statement at ¶¶ 27-28].  This further suggests that, to the extent these noises and imitations were directed at Asante, their intent was to express frustration with Asante's management style; not to discriminate against or otherwise target her protected status.

In summary, Asante's evidence—consisting of racially and ethnically neutral stray remarks, most of which were made by subordinates, some of which were made long before her termination, and all but one of which were not objectively directed at her—is insufficient to support a rational inference that race or national origin discriminatory animus was a determinative factor in Sodexo's decision to remove Asante from her assignment, not reassign her to another client, or terminate her employment. *See, e.g., Henry v. Wyeth Pharmaceuticals, Inc.*, 616 F.3d 134 (2d. Cir. 2010); *Coudert v. Janney Montgomery Scott, LLC*, 171 Fed. App'x 881 (2d Cir. 2006).

      ii.      <u>Asante's Evidence of Disparate Treatment is Also<br>Insufficient to Raise an Inference of Discriminatory Intent.</u>

Finally, Asante fails to raise an inference of discrimination based upon Sodexo's decision to reassign her younger colleague, Lester, because she has failed to put forth evidence showing that Lester was similarly situated or that Lester was treated more favorably than Asante.  *See Adams-Martin v. Connecticut Dept. of Dev. Servs.*, No. 3:10-cv-00099 (VLB), 2012 WL 878306, at **12–13 (D. Conn. Mar. 14, 2012).  As Sodexo notes, Lester held a different, non-managerial position with

different job responsibilities and was managed by Asante.  *See* [Dkt. #61 at 38].

Other than the fact that Lester was also employed by Sodexo and was working at

the same client site, Asante offers no evidence that she and Lester were similarly

situated.  [Dkt. #66, P's Local Rule 56(a)(2) Statement at ¶¶ 19, 21].  This is plainly

insufficient.  *See, e.g., Leveen v. Stratford Hous. Auth.*, 629 F. Supp. 228, 233 (D.

Conn. 1986).  Asante also offers no evidence that Lester received any assistance

with her internal job search.  At most, the portions of her deposition to which

Asante cites indicate that Farrell allegedly told Lester he would help her.  [Dkt. #66,

P's Local Rule 56(a)(2) Statement at ¶ 21; Dkt. #65-3, Asante Dep. at 35:6-37:23,

212:20–214:2].  However, Asante puts forth no evidence that anyone, including

Farrell, did anything to aid Lester in obtaining another job within Sodexo beyond

providing Lester with the same resources given to Asante.[14]

Consideration of untimely alleged acts of disparate treatment, namely,

Asante's receipt of less pay than Krolick, her predecessor at ECHN MMH, and

Asante's allegedly improper transfer to ECHN Woodlake, does not change this

conclusion.  As noted above, Asante fails to put forth any evidence that she and

Krolick were similarly situated, or that the ethics complaint Farrell filed with regard

to Sodexo's contract with ECHN Woodlake had anything to do with the termination

of the contract, let alone that Farrell or Dutton knew that it did at the time they

transferred her.

---

[14] Similarly off-base is Asante's reliance on "Sodexo's posting policies" to support
her claim that Sodexo improperly refused to assist her in securing another
position.  [Dkt. #65 at 9].  The policy to which Asante cites clearly became
"effective June 10, 2013" and superseded earlier policies.  [Dkt. #63-10 at 1].  Since
Asante was terminated in December 2011, this policy was not in effect at the time
and is thus irrelevant.  In addition, the only assistance the policy appears to
require is that Sodexo managers post available positions and give sufficient notice
of these positions and their requirements.

### 3.  Asante Fails to Rebut Sodexo's Legitimate Non-discriminatory Explanations

Even if Asante had cleared the *de minimis* hurdle of setting forth a *prima facie* case of discrimination under Title VII, she does not come close to establishing that the legitimate non-discriminatory reasons Sodexo has proffered in response are pretextual.

"An employer's reason [for terminating an employee] cannot be proved to be a pretext for discrimination unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." *Donovan v. Yale Univ.*, No. 3:12-cv-00549 (VLB), 2014 WL 701511, at *10 (D. Conn. Feb. 24, 2014) (emphasis in original) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993)).  For the reasons discussed above, neither the timely evidence offered by Asante in the form of the animal sounds, Planet Fitness commercial, and Lester's reassignment, nor the untimely evidence consisting of Butler's and Farrell's comments, Asante's transfer to ECHN Woodlake, and her eventual male replacement at ECHN MMH, demonstrate that discrimination was the real reason for Asante's termination.  Moreover, Sodexo proffered three legitimate non-discriminatory reasons for its decision not to reassign and to terminate Asante: (i) ECHN Woodlake cancelled its contract with Sodexo; (ii) Asante was removed by ECHN Woodlake because of her management style; and (iii) Asante failed to find an alternative position within Sodexo prior to December 30, 2011.  None of Asante's arguments challenging Sodexo's legitimate non-discriminatory reasons are successful.  *See* [Dkt. #65 at 6-11].

Asante attempts to undercut Sodexo's first reason by arguing that she was removed from ECHN Woodlake prior to the termination of the contract and had understood she was not to return to Sodexo.  [*Id.* at 7].  However, this argument is

**32**

flawed because it overlooks the fact that her employment at Sodexo continued over a month after she left ECHN Woodlake.  Rather than immediately terminate her employment upon her removal, the November 2011 letter Asante received plainly stated that Asante would "remain a Sodexo employee through December 30, 2011," and before this time, Asante could "actively post to other Sodexo positions that [she was] qualified for."  [Dkt. #63-6 at 1].  However, if by "the end of December 30, 2011 [Asante had] not secured another Sodexo position" she would "be separated from Sodexo for lack of work."  [*Id.*].  In addition, Asante does not offer evidence that on the date she was given this letter, she was told to leave Sodexo for good, with no possibility of reassignment.[15]

Asante next asserts that it is "a material issue of fact in dispute as to whether Ellen Belanger even had the authority to . . . terminate[ ] the contract" between ECHN Woodlake and Sodexo.  [Dkt. #65 at 7].  According to Asante, this is relevant because, if Belanger lacked this authority, it "means the Plaintiff could not have been terminated on the basis of Defendant's first stated reason."  [*Id.* at 7–8].  This

---

[15] In this regard, Asante offers her deposition testimony, which establishes only that Farrell asked for the password to her computer, ambiguously stated to Asante, "[y]ou got to go," and on some unspecified future date, Asante attempted to retrieve some belongings she left behind and was informed that they had been discarded.  [Dkt. #65-3, Asante Dep. at 194:20–25; 214:21–215:23].  Asante also contends in her Rule 56(a)(1) Statement, without support, that "Farrell's tone when he gave [Asante] the Termination Letter indicated that [Asante] was required to leave immediately."  [Dkt. #66, P's Rule 56(a)(1) Statement at ¶ 48].  This evidence is not only insufficient to support Asante's claim that she was permanently discharged from Sodexo on or around November 14, 2011, but also fails to establish that Asante was constructively discharged on this date.  *See Chertkova v. Connecticut Gen. Life Ins. Co.*, 92 F.3d 81, 89 (2d Cir. 1996) ("Constructive discharge of an employee occurs when an employer, rather than directly discharging an individual, intentionally creates an intolerable work atmosphere that forces an employee to quit involuntarily . . . Working conditions are intolerable if they are so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.") (internal quotations and citations omitted).

33

is a red herring, as Asante offers no evidence that anyone at either ECHN Woodlake or, more importantly, Sodexo, had even considered whether Belanger lacked such authority at any time prior to the termination of the contract, or otherwise questioned whether the contract was validly terminated.  A later determination that Belanger lacked authority would have no bearing on Sodexo's state of mind at the time it terminated Asante.

Asante also offers a false dichotomy in arguing that Sodexo "*has changed the* [second] *reason* for termination."  [*Id*. at 8 (emphasis in original)].  She first points to language in the November 2011 letter stating that Belanger requested her removal for "not meeting her expectations," and then claims that Sodexo has offered a "new reason . . . issues with [Asante's] management style."  [*Id*.].  First, this appears to be an argument of semantics, given that issues with Asante's management style may well have been the basis for Belanger's conclusion that Asante was not meeting expectations.  Second, Asante's explanation for Sodexo's alleged need "to modify the original reason for termination" is not well-founded.  [*Id*.].  Asante asserts that Belanger "denied that she ever told Farrell that [Asante] did not meet hers, or anyone at ECHN's, expectations," and cites to two questions and answers from Belanger's deposition testimony for support.  [*Id*.].  However, this testimony does not support Asante's conclusion.  Belanger testified only that she never told Farrell "*to terminate* Miss Asante for not meeting expectations."  [*Id*. at 9 (emphasis added)].  This says nothing about whether Belanger ever told Farrell that Asante was not meeting her expectations, separate from any request that Asante be terminated.  Far more significant is that this testimony does nothing to undermine the position Sodexo has consistently taken throughout this litigation—that Belanger

**34**

requested that Farrell "remove" Asante from the ECHN Woodlake facility because she failed to meet her expectations.  The second colloquy Asante cites not only offers no support for her contention, but actually reinforces the conclusion that both sets of questions concern *Sodexo's* subsequent termination of Asante.[16]  [*Id.*].  Indeed, Belanger plainly testified that *she* "requested" Asante's removal and that she made this request to Sodexo.  [Dkt. #62-5, Belanger Dep. at 144:4–145:23].  Belanger also referenced Farrell in connection with her request.  *See* [*id.* at 145:8-11 ("[T]he easiest thing for me to do . . . is to suggest to Tom [Farrell] I think we need to bring somebody else in and let them finish it out.")].[17]

Finally, Asante unsuccessfully attempts to undermine Sodexo's third reason for termination, that Asante failed to find another job within Sodexo by December 30, 2011.  [Dkt. #65 at 9].  Asante points to portions of Sodexo's Employee Handbook, which she claims "specifically requires Constructive Counseling process to be used followed by written warnings and an investigatory suspension, prior to termination."  [*Id.*].  However, these portions do not support any such progressive discipline requirement.  The Handbook states:

---

[16] Belanger was asked the following question and gave the following answer:

Q: Okay, and did anybody tell you either before or after that Miss Asante was terminated because during the course of the transition ECHN had requested her removal for not meeting expectations?

A: No.

[Dkt. #63-21, Belanger Dep. at 97:7–11].

[17] Nevertheless, throughout her summary judgment briefing, Asante repeats the unsupported contention that Belanger denied ever having told Farrell that she requested Asante's removal from ECHN Woodlake.  *See* [Dkt. #63-1 at 9–11, 17–20; Dkt. #65 at 8–9].

> When employee performance does not meet Company
> standards, the Constructive Counseling process is used to
> ensure understanding of the expectations.  Through our
> constructive counseling process, your manager will decide
> what action is appropriate by considering such factors as
> your work history, frequency of policy violations, conduct,
> past and present level of performance, and the
> seriousness of your offense.  *Counseling actions may
> include coaching, written warning, and/or termination of
> your employment . . . . The use of any or all of these
> options is up to the business judgment of the manager* in
> light of the severity of the offense and all circumstances
> surrounding the unsatisfactory performance or
> inappropriate behavior.

[Dkt. #65-4 at 45 (emphasis added)].  Contrary to Asante's assertion, the Handbook does not entitle Asante to every possible action encompassed by the Constructive Counseling process.  Instead, the Handbook merely describes a framework through which a manager should decide upon an appropriate course of action, and empowers the manager to rely on his "business judgment" when choosing which of the constructive counseling actions, including termination, to employ.  [*Id.*].  Asante offers no evidence that Farrell and Sodexo failed to exercise their business judgment or take into account the circumstances surrounding Asante's performance when they recalled and declined to reassign her.  Indeed, as Sodexo explained, one of the legitimate non-discriminatory reasons for Sodexo's decision was Belanger's statement to Farrell that Asante had failed to meet expectations.  The record also contains evidence of ECHN employee criticism of Asante's management decisions.  While the Handbook does state that "the Company hopes to correct most types of unsatisfactory performance or conduct through constructive counseling measures," and that "some types of performance and misconduct are so severe that they may warrant termination without any prior constructive counseling options," this does not mean that Sodexo was precluded

from terminating Asante in the absence of such "severe" circumstances, or that it was required to first attempt other constructive counseling options.  [*Id.* at 46].  This is particularly true given that both the Handbook and Asante's offer letters clearly indicated that she was an at-will employee.  *See infra* at Part IV.g.

### b.  Sodexo is Entitled to Summary Judgment on Asante's Title VII Retaliation Claim

Title VII's anti-retaliation provision prohibits an employer from discriminating against an employee because that individual "opposed any practice" made unlawful by Title VII.  42 U.S.C. § 2000e-3(a).  Title VII retaliation claims, like discrimination claims, are examined under *McDonnell Douglas*.  *See Goins*, 555 F. App'x at 73–74. To prevail on a Title VII retaliation claim, a plaintiff must first set out a *prima facie* case of retaliation, at which point a presumption of retaliation arises, and the defendant must proffer a legitimate, nondiscriminatory reason for the adverse employment action.  *Fincher*, 604 F.3d at 720.  If the employer succeeds at the second stage, the plaintiff "must show that one of her complaints was a 'but-for' cause of her termination" to prove a retaliation claim.  *Goins*, 555 F. App'x at 74. To set forth a *prima facie* case of retaliation, a plaintiff must demonstrate that (1) she engaged in protected activity; (2) her employer was aware of that activity; (3) the plaintiff suffered a materially adverse employment action; and (4) there was a causal connection between the protected activity and that adverse action.  *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 552 (2d Cir. 2010).

Asante's retaliation claim is predicated on her complaints to two ECHN employees, Morey and Belanger, about the animal noises and commercial imitations, her employer Sodexo's knowledge of these complaints, and the conclusion that Sodexo retaliated against Asante by declining to reassign and

terminating her shortly after learning of her complaints.  *See* [Dkt. #63-1 at 19; Dkt. #65 at 14-16].  Asante fails to set forth a *prima facie* case of retaliation for several reasons.

First, for the reasons described in the analysis of Asante's discrimination claims, *see supra* at Part IV.a, she is unable to satisfy the first element because the animal noises and commercial imitations about which Asante complained do not constitute statutorily prohibited discrimination.  *See Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000) ("The term 'protected activity' refers to action taken to protest or oppose *statutorily prohibited discrimination*.") (emphasis added).  To the extent Asante believed that the actions about which she complained were discriminatory, such belief was not reasonable in light of their context and substance.  *See Kelly v. Howard I. Shapiro & Assocs. Consulting Engineers, P.C.*, 716 F.3d 10, 14–15 (2d Cir. 2013) (stating that a complaint qualifies as a protected activity only if "the employee has a good faith, reasonable belief that the underlying challenged actions of the employer violated the law . . . . A plaintiff's belief on this point is not reasonable simply because he or she complains of something that appears to be discrimination in some form").

Second, Asante has not put forth any evidence that her employer, Sodexo, was aware of either the ECHN employees' conduct or Asante's complaints to Belanger and Morey at the time Sodexo terminated her.  At most, there is evidence that Belanger told Farrell, Asante's supervisor at Sodexo, that Asante failed to meet her expectations.  *See* [Dkt. #63-2, P's Local Rule 56(a)(1) Statement at ¶ 36; Dkt. #68, D's Local Rule 56(a)(2) Statement at ¶ 36].  As a result, Asante failed "to put [her] employer on notice of the specific conduct complained of so a reasonable

38

opportunity to rectify the situation would be afforded." *Dinice-Allen v. Yale-New Haven Hosp.*, No. 3:06-cv-00675 (PCD), 2008 WL 160206, at *4 (D. Conn. Jan. 10, 2008) ("To be a protected activity, complaints must alert the employer to the specific unlawful conduct complained of.").

Sodexo's lack of knowledge of Asante's reports to Belanger would also likely sever any possible causal connection between these reports and Sodexo's decision not to reassign and to terminate her.  *See Gordon v. Marquis*, No. 3:03-cv-01244 (AWT), 2007 WL 987553, at *10 (D. Conn. Mar. 31, 2007) (concluding in the First Amendment retaliation context that "a causal connection cannot exist if the person allegedly responsible for the adverse action had no knowledge of the protected activity") (citation and quotations omitted).[18]

Finally, even if Asante is found to have set forth a *prima facie* claim, she is unable to overcome Sodexo's legitimate, non-retaliatory reasons for her termination, as discussed above.  *See supra* at Part IV.a.

   c.   <u>Sodexo is Entitled to Summary Judgment on Asante's Title VII Hostile Work Environment Claim</u>

Asante relies on the same conduct described elsewhere in support of her Title VII hostile work environment claim.  To establish a claim for a hostile work environment under Title VII, a plaintiff must show that the complained-of conduct is "(1) objectively severe or pervasive; (2) creates an environment that the plaintiff herself subjectively perceives as hostile or abusive; and (3) creates such an

---

[18] While the Court is cognizant of the possibility of "cat's paw" liability, *see supra* at Part IV.a.2.i, n. 11, here, Asante has failed to set forth any evidence that Belanger's conclusion that Asante failed to meet expectations was based, in whole or in part, on Asante's reporting the discriminatory conduct of her ECHN subordinates.  Such a conclusion does not naturally flow given the evidence in the record that Asante's colleagues separately complained to other members of ECHN management about some of Asante's management decisions.

environment because of the plaintiff's race" or membership in a different protected class.  *Goins*, 555 F. App'x at 71–72.  To determine whether an environment is objectively hostile or abusive, a court must "look[ ] at *all* the circumstances."  *Kaytor*, 609 F.3d at 547 (citation and quotations omitted):

> These may include the *frequency* of the discriminatory conduct; its *severity*; whether it is *physically threatening* or *humiliating*, or a mere offensive utterance; and whether it *unreasonably interferes with an employee's work performance*.  The effect on the employee's psychological well-being is, of course, relevant to determining whether the plaintiff actually found the environment abusive.  But while psychological harm, like any other relevant factor, may be taken into account, *no single factor is required*.

*Id.* (citation and quotations omitted).  As a result, "[i]solated incidents generally will not suffice to establish a hostile work environment unless they are extraordinarily severe . . . [although] even a single episode of harassment, if severe enough, can establish a hostile work environment."  *Id.* (citation and quotations omitted).

For many of the same reasons discussed in connection with her other Title VII claims, Asante's hostile work environment claim fails as a matter of law.  While the Court considers both sets of timely and untimely remarks and other conduct, Asante's allegations simply fail to establish that this conduct was objectively severe or pervasive.

Applying the factors outlined in *Kaytor* and considering all other relevant facts, Butler and Farrell each made their comments one time, at Asante's job interview in March and at a lunch in June 2010, respectively.[19]  The comments were ambiguous and, at most, constituted offensive utterances.  *See Zayas v. Caring*

---

[19] Though Asante suggests that Farrell made his "dirty politics" comment more than once, the comment itself was facially neutral and not even objectively offensive in any manner.

*Cmty. of Connecticut*, No. 3:11-cv-442 (VLB), 2012 WL 4512760, at *7 (D. Conn. Oct.

1, 2012) (distinguishing "offhand comments" and "isolated incidents (unless

extremely serious)" from "discriminatory changes in the terms and conditions").

Given their one-off and ambiguous nature, it is difficult to see how such comments

could reasonably have interfered with Asante's job performance. *See id.* (granting

defendant's motion for summary judgment on hostile work environment claim

where the allegedly discriminatory statements were made thirteen times in a five-

year period and citing other cases rejecting hostile work environment claims based

on infrequent comments made over long periods of time).

 Similarly, the animal noises and imitations fail to reach the level of objectively

severe or pervasive.  They too were, at most, ambiguous, offensive utterances,

which lacked any direct connection to any of the protected classes to which Asante

belongs.   While the record indicates that they occurred often throughout a period of

time, the duration is uncertain, and Asante acknowledged that the animal sounds

ceased and the imitations lessened after she confronted one of the ECHN

employees.  *See* [Dkt. #62, D's Rule 56(a)(1) Statement at ¶ 56; Dkt. #66, P's Rule

56(a)(1) Statement at ¶ 56; Dkt. #65-3, Asante Dep. at 193:11–194:9].  To the extent

that they did relate to Asante in some way, they were no doubt disruptive and

offensive, but the fact that they occurred while the employees were on break or

when returning from break or lunch and when Asante was in her partially separated

office renders them unlikely to have unreasonably interfered with Asante's work

performance.  *See Jackson v. Health Resources of Rockville, Inc.*, 357 F. Supp. 2d

507, 520 (D. Conn. 2005) (granting defendant's motion for summary judgment as to

plaintiff's hostile work environment claim despite evidence that plaintiff's "fellow employees made fun of her by calling her 'monkey' and laughing at her wig").

Finally, the facts underlying Asante's claims of disparate treatment, while relevant to a hostile work environment claim, are not objectively pervasive or severe.  Asante has failed to establish that she was similarly situated to the individuals who were allegedly treated more favorably, and in some cases, she has failed to put forth evidence that these individuals actually received preferential treatment.  In addition, the fact that these three instances span a period of years and involve individuals of different protected classes further cuts against a finding of pervasiveness.

### d.   Sodexo is Entitled to Summary Judgment on Asante's Attempted Religious Discrimination Claim

To the extent that Asante attempts to belatedly assert a religious discrimination claim under Title VII, this claim is also insufficient to survive summary judgment.  In an attempt to support her claim, Asante offers her deposition testimony regarding comments Farrell allegedly made to her at some point, such as, "you think God have time for you.  We all need prayers.  And you always say God, why?  You think you are the only person who cares about that – that kind of stuff?"  [Dkt. #65 at 16–17].  These generic comments about "God," which "could have been intended as a crude joke or as a serious accusation" that everyone seeks and needs the help of God and Asante is no different, "offer[ ] no evidence that [Farrell] harbored anti-[Pentecostal] bias." *Lynch v. Pathmark Supermarkets*, 987 F. Supp. 236, 243 (S.D.N.Y. 1997) (holding that comments generally referencing "God" and criticizing and even threatening the plaintiff failed to support a *prima facie* case of religious discrimination, "even with all rational

**42**

inferences drawn in the plaintiff's favor"); *Wooten-Francis v. City of New York*, 2013 WL 6729851, No. 11-CV-2341 (FB) (MDG), at **3–5 (E.D.N.Y. Dec. 19, 2013) (granting defendant's motion for summary judgment on Title VII retaliation and hostile work environment claims based, in part, on the statement "[w]here is your God now?" and finding such statement did not "rise[ ] to the level of severity or pervasiveness the law requires").

### e. Sodexo is Entitled to Summary Judgment on Asante's Age Discrimination Claim Under the ADEA

Under the ADEA, "it shall be unlawful for an employer . . . to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age."  29 U.S.C. § 623(a)(1).  Claims of discriminatory treatment under the ADEA are analyzed using the burden-shifting framework set forth in *McDonnell Douglas*, as modified by the Supreme Court's subsequent decision in *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009).  *See Gorzynski v. Jetblue Airways Corp.*, 596 F.3d 93, 106 (2d Cir. 2010) (finding post-*Gross* that "we remain bound by, and indeed see no reason to jettison, the burden-shifting framework for ADEA cases that has been consistently employed in our Circuit").

Like in Title VII cases, after the plaintiff has met the initial burden of establishing his *prima facie* case, "the burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason for the adverse employment action."  *Brennan*, 650 F.3d at 93 (citing *McDonnell Douglas*, 411 U.S. at 802).  "Once such a reason is provided, the plaintiff can no longer rely on the prima facie case, but may still prevail if she can show that the employer's determination was in fact the result of discrimination." *Gorzynski*, 596 F.3d at 106.  However, at this step,

"*Gross* makes clear that [unlike in Title VII claims] 'a plaintiff bringing a disparate-treatment claim pursuant to the ADEA must prove, by a preponderance of the evidence, that age was the 'but-for' cause of the challenged adverse employment action' and not just a contributing or motivating factor." *Id.* (quoting *Gross*, 557 U.S. at 180).

The only facts Asante offers in support of her age discrimination claim are that (i) following her requested transfer from ECHN MMH, she was replaced by a younger male; and (ii) after ECHN Woodlake terminated its contract with Sodexo, her younger colleague, Lester, was reassigned (with assistance) within Sodexo, while Asante did not receive any assistance and was not reassigned.

Even accepting Asante's disputed assertion that she was ultimately replaced at ECHN MMH by a "younger white male employee," her ADEA claim is insufficient. First, and most importantly, her claim is untimely for the reasons stated *supra* in Part IV.a.1.  *See Morgan*, 536 U.S. at 113.  Second, as Sodexo asserts, and Asante does not deny, Asante was initially replaced by a female between 50 and 60 years old.  *See, e.g., Lee v. Universal Printing Servs., Inc.*, No. 3:06-cv-961 (WWE), 2008 WL 2740325, at *3 (D. Conn. Jul. 15, 2008) (holding that where "plaintiff was replaced by an employee who defendant claims was approximately the same age as plaintiff . . . plaintiff cannot establish the prima facie case of age discrimination under the ADEA").

At most, the facts Asante offers with regard to Sodexo's decision to reassign her younger colleague, Lester, are sufficient to set forth a *prima facie* case.  *See, e.g., Toomer v. Dep't of Educ. of New York*, No. 09-Civ-9034, U.S. Dist. LEXIS 44952, at *27-29 (S.D.N.Y. Mar. 28, 2013) (finding that plaintiff had established a prima facie

**44**

case of age discrimination where plaintiff asserted that her replacement was "young" without specifying the age range of the replacement and where defendant likely knew plaintiff's age).  Asante does not, however, come close to overcoming Sodexo's legitimate, non-discriminatory reasons for its actions.

As Sodexo points out, the two were not similarly situated because Lester held a different, lower-level position at ECHN Woodlake and, unlike Asante, Lester had not been asked to leave by ECHN Woodlake before the end of her time there. Asante simply offers no facts that her age had anything to do with this decision.

### f.  Asante's CFEPA Claims Fail For the Same Reasons

Asante brings parallel claims based on the same conduct under the CFEPA. Employment discrimination, retaliation, and hostile work environment claims arising under the CFEPA are analyzed under the same *McDonnell Douglas* burden-shifting analysis as those brought under Title VII.  *See John v. Bridgeport Bd. of Educ.*, No. 09-cv-378 (VLB), 2011 WL 1106708, at **9, 15, 17 (D. Conn. Mar. 22, 2011).  Thus, for the same reasons discussed above, Sodexo is entitled to summary judgment as to each of these claims that Asante has brought under the CFEPA.

While courts also analyze age discrimination claims brought pursuant to the CFEPA under *McDonnell Douglas*, to rebut an employer's proffered non-discriminatory explanation under CFEPA a plaintiff need only show that her age was a "contributing or motivating factor" in bringing about the adverse employment action, as opposed to the but-for cause.  *Tremalio v. Demand Shoes, LLC*, No. 3:12-cv-00357 (VLB), 2013 WL 5445258, at *20 (D. Conn. Sept. 30, 2013).  However, even under this less onerous standard, Asante's threadbare assertions of age discrimination are unable to survive summary judgment.  *See supra* at Part IV.e.

### g.  **Asante's Breach of Contract Claim Fails as a Matter of Law**

Asante further alleges that Sodexo breached her employment contract when it terminated her without cause.  To establish a claim for breach of contract under Connecticut law, a plaintiff must demonstrate: (i) the existence of a contract or agreement; (2) breach of the contract or agreement; and (3) damages resulting from the breach.  *Chem-Tek, Inc., v. General Motors Corp.*, 816 F. Supp. 123, 131 (D. Conn. 1993) (citing *O'Hara v. State*, 218 Conn. 628 (1991)).

"In Connecticut, an employer and employee have an at-will employment relationship in the absence of a contract to the contrary.  Employment at will grants both parties the right to terminate the relationship for any reason, or no reason, at any time without fear of legal liability."  *Joyner v. Simkins Indus., Inc.*, 111 Conn. App. 93, 97 (Conn. App. 2008) (citing and quoting *Thibodeau v. Design Group One Architects, LLC*, 260 Conn. 691, 697–98 (2002).  Two exceptions to this rule are where a "discharge involve[s] impropriety derived from some important violation of public policy," *id.*, or, where a plaintiff is able to establish "the existence of an implied agreement between the parties" in which the employer "agreed, either by words or action or conduct, to undertake some form of actual contract commitment to him under which he could not be terminated without just cause."  *Morrissey-Manter v. St. Francis Hosp. & Med. Ctr.*, No. HHDCV126035162S, 2015 WL 467256, at *5 (Conn. Super. Jan. 5, 2015) (quoting *Torosyan v. Boehringer Ingelheim Pharms., Inc.*, 234 Conn. 1, 14–15 (1995)).  "[R]epresentations contained in an employee handbook" or an offer letter may "give rise to an express or implied contract . . . under certain circumstances."  *Grossman v. Computer Curriculum Corp.*, 131 F. Supp. 2d 299, 305 (D. Conn. 2000); *see also Naser v. Ravago Shared Servs., LLC*, No.

3:10-cv-573 (WWE), 2010 WL 3829159, at *3 (D. Conn. Sept. 20, 2010) (reviewing offer letter to determine if it created an express or implied contract altering the default at-will relationship).  On the other hand, "by including appropriate disclaimers of the intention to contract, employers can protect themselves against employee contract claims based on statements made in personnel manuals."  *Manning v. Cigna Corp.*, 807 F. Supp. 889, 895 (D. Conn. 1991) (citation and quotation omitted).

As an initial matter, for the reasons discussed above, none of the conduct Asante raises is sufficient to establish that her termination arose out of any violation of public policy. In addition, Sodexo has put forth considerable evidence that Asante was an at-will employee whom it could terminate without cause.

Each of Asante's offer letters, in 2008, 2010, and 2011 contained express language stating that she was "not offer[ed] employment on a fixed term basis," and that she and Sodexo "may terminate employment at any time, for any reason, and with or without cause."  [Dkt. #62, D's Rule 56(a)(1) Statement at ¶ 10; Dkt. #66, P's Rule 56(a)(1) Statement at ¶ 10].  Asante also signed each of these letters, and above her signature was a statement affirming her understanding that "this is not an employment contract and that I am an employee at will."  [*Id.* at ¶ 11].

In response, Asante points to language in her March 2, 2010 offer letter, stating: "This payment is contingent upon you remaining in this position for a one-year period of time."  [Dkt. #65 at 20].  While Asante rightly contends that "merely putting the 'at will' language in a contract is not dispositive of the issue," [*id.*], she omits critical sentences immediately preceding and following the one she quotes. The complete relevant passage reads:

> In addition, for accepting the position, you will receive a
> one-time bonus payment of $5,000, subject to applicable

> taxes, to be paid after 30 days of employment.  This payment is contingent upon you remaining in this position for a one-year period of time.  If you voluntarily leave this position at any time prior to the one-year time period, you will be responsible for paying back a pro rata amount of this signing bonus . . . to Sodexo.

[Dkt. #62-9 at 1].  The full passage makes clear that the portion of her compensation contingent upon her remaining at Sodexo for a one-year period was a signing bonus, not her salary.  Connecticut courts have stated that even "an annual salary term" does not "create a contract of employment for a determinative term."  *Swihart v. Country Home Bakers*, No. CV 9706094S, 1999 WL 545385, at *1 (Conn. Super. Jul. 16, 1999); *see also Cruz v. Visual Perceptions, LLC*, 136 Conn. App. 330, 335 (Conn. App. 2012), *rev'd on other grounds*, 311 Conn. 93 (Conn. 2014) (citing several cases in support of proposition "that a contract provision expressing an employee's compensation in terms of an annual salary does not create a contract for employment of definite duration").  Not surprisingly, they have rejected the argument "that the promise of a bonus . . . by the employer somehow turns an at will employment contract into one only terminable for cause."  *Swihart*, 1999 WL 545385, at *2.

In addition, Asante's suggestion that this provision is ambiguous is baseless.  The plain language of the letter makes clear that in order for Asante to receive all of her signing bonus, she would need to remain employed at Sodexo for a year.  Nothing in this provision, which imposes a requirement on Asante, imposes any reciprocal duty on Sodexo that it keep her employed for this or any period of time.  Neither of the cases to which Asante cites, *Cruz v. Visual Perceptions, LLC*, 311 Conn. 93 (Conn. 2014) and *Puglia v. Town of Westbrook*, No. CV 065000446, 2008 WL 2930345 (Conn. Super. Jul. 9, 2008), holds to the contrary.

48

The language of the contract in *Cruz* bears little resemblance to the language upon which Asante relies.  There, the employment contract began with the sentence: "This will cover the thirty-six month period starting April 1, 2007 and ending March 31, 2010."  *Cruz*, 311 Conn. at 97.  No such sentence fixing any date range appears in any of Asante's offer letters.[20]  By contrast, Asante's offer letters merely describe her salary as "$1,230.769 per week paid biweekly ($64,000 annualized)" and "$1,383.064 per week paid biweekly ($71,919.36 annually)" respectively.  [Dkt. #63-11 at 1; Dkt. #63-14 at 1].  The *Cruz* court next focused on "the portion of the letter agreement providing that any increase in health insurance premiums would be absorbed by the defendant 'for the duration of the contract.'" *Id.* at 104.  Once again, no provision in any of Asante's offer letters fixes any benefit to "the duration of the contract."[21]  The court then pointed out a "provision governing the paid personal days that the plaintiff would receive in each year during the thirty-six month period."  *Id.*  Based on these three provisions, the court found that the letter was ambiguous as to the "intent to create a definite term of employment *or* an intent to set the terms and conditions of an at-will employment contract."  *Id.* (emphasis in original).   Just as telling as the three provisions the *Cruz* court focused on are the ones that it did not.  Like Asante's offer letter, the contract in *Cruz* described the plaintiff's compensation in terms of both weeks and

---

[20] Indeed, the only reference to any dates in these letters is the date on which Asante's salary became effective and "*Sodexo's* current management performance planning year."  [Dkt. #63-11 at 1; Dkt. #63-14 at 1 (emphasis added)].

[21] Asante vaguely refers the Court to her offer letters which she claims contain "terms regarding . . . benefit plans that are indicative of an express contract." [Dkt. #65 at 22].  However, no such terms are apparent.  The only tangentially relevant comment regarding benefits states that "[a]ll benefits and medical coverage will remain the same."  [Dkt. #63-11 at 1; Dkt. #63-14 at 1].  This, of course, says nothing about duration, nor does it otherwise suggest an intent to contract.

"per year," health and dental insurance "per year," and a "potential monthly bonus." *Id.* at 97. Finally, there is no evidence that the employment contract in *Cruz* contained "disclaimers of the intention to contract," like the express language in Asante's offer letters. *Manning*, 807 F. Supp. at 895.

As Sodexo points out, the contract at issue in *Puglia*, the other case Asante cites, is also inapposite. There, the contract stated that the plaintiff would be paid "a salary of $52,899.00 for the school year beginning July 1, 2004 and ending June 30, 2005." *Puglia*, 2008 WL 2930345, at *2. Thus, this contract, like the one in *Cruz* and unlike Asante's, expressly set the plaintiff's salary to a fixed duration of time. Other provisions of the contract also referred back to "the above stated period," and a subsequent employment agreement described the plaintiff's salary for another set period of time. *Id.* Also, like the *Cruz* contract and unlike Asante's, absent from the employment agreements in *Puglia* was any language expressly disclaiming any intention to enter into a contract.[22]

### h. Sodexo is Entitled to Summary Judgment on Asante's Intentional and Negligent Infliction of Emotional Distress Claims

Asante brings claims of intentional and negligent infliction of emotional distress, based on the conduct underlying her Title VII, ADEA, and CFEPA claims. To establish a claim for intentional infliction under Connecticut law, the plaintiff

---

[22] The March 2009 Sodexo Employee Handbook also contained language clearly indicating an at-will relationship. The Handbook stated that the employment relationship between Sodexo and Asante was "terminable at any time[,] by either you or us, with or without cause and with or without notice. The Handbook is not a contract of employment." [Dkt. #62, D's Local Rule 56(a)(1) Statement at ¶ 12; Dkt. #66, P's Local Rule 56(a)(2) Statement at ¶ 12]. Asante acknowledges this language but refers generally to five pages of the Handbook regarding Sodexo's progressive disciplinary measures, up to and including termination. To the extent Asante is suggesting that language in the Handbook describing circumstances in which Sodexo may terminate an employee for cause somehow limits Sodexo's ability to terminate an at-will employee for *any* lawful reason, she is mistaken.

must show that: (1) the actors involved intended to inflict emotional distress or that the actor knew or should have known that emotional distress was the likely result of the actor's conduct; (2) the conduct was extreme and outrageous; (3) the defendant's conduct caused he plaintiff's distress; and (4) the emotional distress the plaintiff sustained was severe.  *Oliver v. Waterbury Bd. of Educ.*, No. 3:12-cv-01285 (VLB), 2014 WL 1246711, at *19 (D. Conn. Mar. 24, 2014).  "Liability for intentional infliction of emotional distress requires conduct exceeding all bounds usually tolerated by decent society, of a nature which is especially calculated to cause, and does cause, mental distress of a very serious kind.  *Id.*  "Conduct  . . . that is merely insulting or displays bad manners or results in hurt feelings is insufficient to form the basis for an action based upon intentional infliction of emotional distress."  *Id.*

As discussed above, taken separately or together, the conduct by the ECHN employees and comments by Asante's supervisor, Farrell, were not extreme or outrageous.  The sounds and imitations were, at most, insulting and displays of bad manners, especially in light of the fact that they were not made in Asante's presence.  Farrell's and Butler's comments and stories were ambiguous and hardly, if at all, offensive.  *Cf. Pottie v. Atl. Packaging Grp. LLC*, No. 3:12-cv-773 (WIG), 2012 WL 6087282, at *1 (D. Conn. Dec. 6, 2012) (finding plaintiff stated a claim for intentional infliction when she alleged "[s]he was subject to a course of verbal abuse and profanity, including being referred to by derogatory names and asked what banana boat she came off, a remark insulting her national origin and ethnicity . . . . She was ridiculed about her appearance in a sexually demeaning manner.  She was physically struck in the head and face with a hand, box or other items").

51

Finally, any differences in pay or treatment with regard to reassignment, even if motivated by discriminatory intent (though Asante has failed to set forth evidence that they were so motivated), are not sufficient to support her intentional infliction claim.  *See Robinson v. City of New Haven*, 578 F. Supp. 2d 385, 390 (D. Conn. 2008) (dismissing plaintiff's intentional infliction claim based on disparate compensation and stating that "it is the employer's conduct, not the motive behind the conduct, that must be extreme or outrageous . . . . An employer's adverse yet routine employment action does not constitute extreme and outrageous conduct even if based on race or other improper motives"); *see also Tomby v. Cmty. Renewal Team, Inc.*, 3:09-cv-1596, 2010 WL 5174404, at *8 (D. Conn. Dec. 15, 2010) ("[R]outine employment action, even if conducted in bad faith, does not constitute extreme or outrageous behavior.") (citation omitted).

Under Connecticut law and "[i]n the employment context, a claim for negligent infliction of emotional distress is only recognized where it is based upon unreasonable conduct of the defendant in the termination process."  *Oliver*, 2014 WL 1246711, at *21 (citation and quotation omitted).  Accordingly, the dispositive issue is "whether the defendant's conduct during the termination process was *sufficiently wrongful* that the defendant should have realized that its conduct involved an unreasonable risk of causing emotional distress and that that distress, if it were caused, might result in illness or bodily harm."  *Id.* (citation and quotation omitted) (emphasis in original).  "To rise to the requisite level, a plaintiff must allege more than mere termination.  Rather  . . . that the actual termination was . . . done in an inconsiderate, humiliating, or embarrassing manner."  *Id.* (citation and quotation omitted).

52

At most, the evidence indicates that (i) ECHN Woodlake notified Sodexo that Asante failed to meet expectations; (ii) Farrell met with Asante, informed her of Belanger's request, and handed her the letter stating that if she did not obtain employment within Sodexo by December 30, 2011, she would be terminated; and (iii) that Farrell used a tone which suggested to Asante that she leave the facility immediately and never return.  [Dkt. #63-1 at 21].  Without more, these events do not come close to raising a viable negligent infliction claim.

V.    **Conclusion**

For the foregoing reasons, Defendant's Motion for Summary Judgment is GRANTED and Plaintiff's Motion for Summary Judgment is DENIED.  Plaintiff's complaint is DISMISSED with prejudice. The Clerk is directed to enter judgment in favor of the Defendant and to close the case.

IT IS SO ORDERED.


_____/s/_____
Hon. Vanessa L. Bryant
United States District Judge


Dated at Hartford, Connecticut: March 31, 2015

53